688 P.2d 187

KENTUCKY FRIED CHICKEN, Petitioner Employer, Cross-Respondent,

St. Paul Fire & Marine Insurance Company, Petitioner Carrier,

v.

The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,

Randall Culwell, Respondent Employee, Cross-Petitioner.

No. 1 CA–IC 3093.

Court of Appeals of Arizona, Division 1, Department B.

July 24, 1984.

Reconsideration Denied Sept. 6, 1984.

Jones, Skelton & Hochuli by Calvin Harris, Phoenix, for petitioners.

Sandra Day, Chief Counsel, The Industrial Commission of Arizona, Phoenix, for respondent.

Hocker & Axford, P.C. by R. Kelly Hocker, Tempe, for respondent employee, cross-petitioner.

## OPINION

OGG, Judge.

This is a special action review of an Industrial Commission award and decision upon review. The respondent employee challenges the award, which determined that his industrial injury had not aggravated a preexisting hip condition. The petitioners employer and carrier challenge the decision upon review, which required the carrier to pay for medical treatment of the hip condition as a penalty for its failure to issue a notice of claim status on time. We set aside the award and decision upon re-

view because the penalty was improperly imposed.

In 1976, the respondent employee (claimant) developed a left hip condition diagnosed as a slipped capital femoral epiphysis. Treating orthopedic surgeon Willard S. Hunter, M.D., performed surgery in 1976 and again in 1977, first to insert pins and then to remove them. After surgery, the claimant walked with a limp and had persistent hip pain. X-rays revealed avascular necrosis and chondrolysis, but the claimant was able to work.

On April 3, 1980, while working as a manager trainee for the petitioner employer, he slipped on a wet floor and twisted his left leg. He immediately reported the incident to his supervisor but was able to continue working.

On April 7, 1980, because of worsening pain from the industrial injury, the claimant saw family physician George Boiko, M.D. Although the claimant asserted that he gave a history of both hip and leg pain, Dr. Boiko's office note mentioned left leg pain only. A workman's and physician's report prepared that day, which the claimant signed, described the injury as follows: "I was walking across the floor and slipped causing pain in left leg calf." Dr. Boiko diagnosed an acute calf muscle strain and recommended rest.

The claimant missed approximately five days of work. On April 11, 1980, Dr. Boiko released him to return to work. After returning to work, the claimant had worsening pain. On April 24, 1980, Dr. Boiko released him from care for the leg injury and referred him to Dr. Hunter for the "old hip problem."

The claimant stopped working because of this hip pain. On May 2, 1980, he saw Dr. Hunter, who diagnosed an acutely fractured femoral head and prepared a May 2, 1980 workman's and physician's report with this diagnosis.[1] A subsequent letter from Dr. Hunter to the carrier recom-

---

1. The file includes a copy of this report, but this copy does not have an Industrial Commission receipt stamp.

mended surgery to repair the fractured femoral head.

On May 19, 1980, a carrier's claims representative, who knew of Dr. Hunter's diagnosis and recommendation for surgery, interviewed the claimant. Shortly after this interview, the carrier orally informed Dr. Hunter that the recommended hip surgery would not be covered.

The carrier subsequently arranged for orthopedic surgeon Gerald C. Moczynski, M.D., to examine the claimant. His June 19, 1980 report concluded:

This patient was apparently symptomatic and did have a limp according to his history prior to this episode. I feel the recent episode was not causative or aggravating to the patient's underlying avascular necrosis except on a very temporary basis.

Due to the patient's underlying avascular necrosis and marked joint deformity he does need a resurfacing procedure as Dr. Hunter suggests, but I do not feel this is the responsibility of the industrial carrier, as this condition pre-exists the present injury.

Later that month, Dr. Hunter performed the recommended surgery. After recovery, the claimant was able to work again. The carrier had paid Dr. Boiko for treatment of the leg injury but did not pay Dr. Hunter for the hip surgery or the claimant for disability benefits.

Nearly two years later, the claimant requested a hearing to determine his entitlement to benefits. *See generally,* A.R.S. § 23–1061(J). In response, the Industrial Commission directed the carrier to issue a notice of claim status and if the notice denied the claim, to indicate the amount of penalty benefits payable. On October 15, 1982, the carrier issued a notice of claim status accepting the claim as a no-time-lost claim but without any penalty benefits. The claimant timely protested this notice.

At the scheduled hearings, Drs. Hunter, Boiko and Moczynski provided the medical evidence. Dr. Hunter reconfirmed his opinion that the industrial injury had fractured the femoral head. He admitted, however, that the dead bone removed in the 1980 surgery was consistent with the preexisting necrosis.

Dr. Boiko did not express a causation opinion, but confirmed that he first noted hip pain on April 24, 1980. He testified that he knew about the claimant's preexisting hip condition and referred him to Dr. Hunter as soon as hip problems developed.

Dr. Moczynski denied that the claimant had acutely fractured the femoral head. Dr. Moczynski interpreted x-rays taken between 1976 and 1980 to reveal progressive deterioration of the underlying condition, not an acute fracture. He confirmed his opinion that Dr. Hunter's surgery was necessary but unrelated to the industrial injury.

On cross-examination, Dr. Moczynski admitted that the claimant's hip pain became disabling after the industrial injury, but denied this history established a causal connection:

A. He had continued complaints of pain in his leg, as the patient told me when he saw me, all through that time [after 1977 surgery, but before industrial injury]. Also, this is a normal progression of the problem. It is a normal progressive complication.

Q. Do you think it is more of just a coincidence that it happened after 4/3/1980?

A. I think patients will have pain after many traumatic episodes and they are unrelated to the event that's taking place.

Q. Are you suggesting that he is malingering?

A. No. I think this patient became acutely aware of his problem when his hip moved more than it did. And those arthritic changes caused an impingement. And that, again, made him aware of the hip problem that he had been ignoring. I see many patients like that.

Q. So, you feel he became more symptomatic, at the very least, by reason of the accident?

A. I think that made the patient again aware of something he was ignoring and trying to live with. And he needed the operation. There was no doubt about it. It was just a question of when the operation would be done.

The administrative law judge issued the award for a no-time-lost claim:

8. When all of the medical and other evidence is considered in its entirety, it reasonably established that by the time the insurance carrier terminated applicant's benefits with no permanent disability, ... applicant's condition resulting from his industrial injury was stationary with no permanent disability attributable thereto; that applicant's hip problem which resulted in the resurfacing of the femoral head in 1980 was not attributable to the industrial injury.

9. Applicant has failed to prove that he is entitled to benefits beyond those provided by the insurance carrier in relation to the industrial injury of April 3, 1980.

On administrative review, these findings were affirmed but amended to provide for penalty benefits:

13. Although the insurance carrier was notified on April 30, 1980, of applicant's claim for workmen's compensation benefits for his injury of April 3, 1980, no action was taken by the insurance carrier until October 15, 1982, when the carrier issued its NOTICE OF CLAIM STATUS *denying* the claim. By letter dated October 6, 1982, Ms. Marjorie L. Dight, Claims Manager for The Industrial Commission of Arizona, notified the insurance carrier that the penalty provisions of *A.R.S.* § 23–1061 M would be applicable.

\*     \*     \*     \*     \*     \*

15. The applicant is requesting compensation pursuant to this statutory provision for the period April 30, 1980, to October 15, 1982. During said period, the applicant underwent hip surgery for a preexisting condition which was ultimately found not to be related to the industrial episode of April 3, 1980. While the applicant did not lose seven days from work initially after the episode which was found to be a compensable accident, he did lose sufficient time as a result of his hip surgery so as to come within the purview of this statute.

16. The statute does not make compensability of a claim a prerequisite to compensation being payable thereunder. In fact, the statute specifically states that medical, surgical and hospital benefits are to be paid from the time the carrier is notified (April 30, 1980) until such time as the carrier issues its NOTICE OF CLAIM STATUS (October 15, 1982) denying the claim. Hence, the situation herein falls directly within the confines of the statute and the applicant is entitled to his medical, surgical and hospital benefits for the treatment and care rendered to him for his hip problem from April 30, 1980, until October 15, 1982. (emphasis added)

Special actions followed challenging both the award and the decision upon review.

We first consider the claimant's challenge to the award, for if he is correct, the employer and carrier's challenge to the decision upon review is moot. He argues that the administrative law judge ignored controlling standards of legal causation. We disagree.

■ In general, an industrial accident need only partially cause an injury. *E.g.*, *Allen v. Industrial Commission*, 124 Ariz. 173, 602 P.2d 841 (App.1979). The employer takes the employee as he is, and if the industrial accident combines with a preexisting condition to cause a further injurious result, this condition is compensable. *E.g.*, *Nelson v. Industrial Commission*, 24 Ariz. App. 94, 536 P.2d 215 (1975). Dr. Moczynski, however, denied that the industrial injury even partially contributed to the 1980 hip condition. These general principles, therefore, are inapplicable to our case.

■ The claimant asserts that Dr. Moczynski conceded causation when he admitted that the claimant's hip pain was

nondisabling before the industrial injury but disabling after it. This admission did not concede causation provided the opinion otherwise accounted for the claimant's symptomatology. *See Arellano v. Industrial Commission*, 25 Ariz.App. 598, 545 P.2d 446 (1976) (refusing to follow *Mengel v. Industrial Commission*, 18 Ariz.App. 541, 504 P.2d 72 (1972)). Dr. Moczynski accounted for it in his opinion that the industrial injury merely increased the claimant's awareness of his preexisting condition. This alone does not make the preexisting condition compensable. *See Ramonett v. Industrial Commission*, 27 Ariz.App. 728, 558 P.2d 923 (1976).

■ The claimant also asserts that the causal relationship between the twisting industrial injury and the 1980 hip condition is apparent to a layman. To the contrary, expert medical testimony establishing causation was indispensable in this case. *See Western Bonded Products v. Industrial Commission*, 132 Ariz. 526, 647 P.2d 657 (App.1982):

> The reasons for this rule are obvious. A lay person does not possess the knowledge necessary to make an accurate diagnosis or to describe a condition's etiology. Even a logical interpretation of events surrounding the industrial incident and claimant's ensuing complaints, when made by a layman, is no more than speculation.

132 Ariz. at 527, 647 P.2d at 658.

The claimant lastly asserts that Dr. Mocsynski's testimony was inconsistent with his June 1980 report, which mentioned a temporary aggravation. Dr. Moczynski qualified his opinion, however, after reviewing the x-ray evidence. According to him, even the July 6, 1977 x-ray showed "fragmentation of the capital femoral epiphysis and fracture at this point."

■ In summary, Dr. Moczynski's opinion supported the award for a no-time-lost claim. We therefore reject the claimant's challenge to the award and must address the employer and carrier's challenge to the decision upon review.

A claimant is entitled to penalty benefits if the carrier fails to timely deny his claim:

> If the insurance carrier ... does not issue a notice of claim status denying the claim within twenty-one days from the date the carrier is notified by the commission of a claim ... the carrier shall pay immediately, compensation as if the claim were accepted, from the date the carrier is notified by the commission of a claim ... until the date upon which the carrier issues a notice of claim status denying such claim. As used in this subsection, "compensation payable" includes medical, surgical and hospital benefits. This section shall not apply to cases involving seven days or less of time lost from work.

A.R.S. § 23–1061(M).

■ The employer and carrier first deny that subsection 23–1061(M) applies to this case because the carrier actually accepted the claim. We agree that this subsection applies only to a denial of the claim. The penalty is that the claim is treated as accepted until a denial is issued. *See Felker v. Industrial Commission*, 134 Ariz. 19, 653 P.2d 369 (App.1982). If a claim is ultimately accepted, the claimant receives these benefits as a matter of course.

A complexity develops, however, with compound claims. For example, consider a worker who claims benefits for both a cut injury and a subsequent infection. The cut injury caused less than seven days lost work, the infection more than seven days lost work. More than 21 days later, the carrier accepts the claim as a no-time-lost claim. Surely the carrier cannot simply avoid penalty benefits by affirmatively couching its denial of this claim for the infection.

On the other hand, if the worker were to claim benefits for the cut injury only, penalty benefits would not include compensation for the infection. The reason for this is not the acceptance of the cut injury claim; we may even assume the stronger case of a denial. The reason is that the measure of the penalty is the compensation payable if the claim had been accepted. An

acceptance of the claim for the cut injury imposes no liability on the carrier for the infection. The claimant must prove that the cut injury caused the infection. *See Noble v. Industrial Commission,* 140 Ariz. 571, 683 P.2d 1173 (App.1984).

The employer and carrier also assert that subsection 23–1061(M) applies only if the worker misses more than seven days work from the injury. The claimant, of course, missed less than seven days work from the leg injury but more than seven days work from the hip condition. We again agree in the abstract, but the same complexity arises here as well. If the claim is compound, the work lost from both conditions must be compounded.

The dispositive question, therefore, is whether the claim in this case was compound. The administrative law judge made no findings on this critical question. Moreover, the record is inadequate for us to make an independent finding.

The initial workman's and physician's report was for a left leg injury only. As noted above, the file also includes a workman's and physician's report for the hip condition, but we cannot determine whether this report was filed. Even if it was, we cannot determine whether the Industrial Commission notified the carrier of it. *See generally, Garcia v. Industrial Commission,* 141 Ariz. 184, 685 P.2d 1336 (App. 1984).

We do not suggest that a claimant must make a formal claim. Any written manifestation of the intent to claim benefits filed with the commission suffices. *See McNatt v. Industrial Commission,* 13 Ariz.App. 158, 474 P.2d 1010 (1970). But the claimant's conversation with the carrier's claims representative and Dr. Hunter's letter to the carrier requesting authorization for the surgery do not satisfy even this minimal standard.

The record, therefore, does not support the imposition of penalty benefits. Because we lack authority to remand for additional findings, we must set aside this award and decision upon review. *See*

A.R.S. § 23–951(D); *Arrowhead Press, Inc. v. Industrial Commission,* 134 Ariz. 21, 653 P.2d 371 (App.1982).

Award set aside.

MEYERSON, P.J., and JACOBSON, C.J., concur.